The **DENVER ROCKETS**, a general partnership, and Ringsby Truck Lines, Inc., a corporation, Plaintiffs,

v.

**ALL–PRO MANAGEMENT, INC.**, a corporation, and Al Ross and Marshall Boyer, individuals, Defendants.

Spencer **HAYWOOD**, Cross-claimant,

v.

The **DENVER ROCKETS**, a general partnership, Ringsby Truck Lines, Inc., a corporation, First Northwest Industries, a corporation, doing business as Seattle Supersonics, and National Basketball Association, an unincorporated association, Cross-defendants.

Civ. No. 70–2575.

United States District Court, C. D. California.

Feb. 2, 1971.

Opinion Granting Partial Summary Judgment March 22, 1971.

Frederick P. Furth, John H. Boone, San Francisco, Cal., Sommer, Tinkham, Barnard & Freiberger, William C. Barnard, Indianapolis, Ind., Hutchinson & Irwin, Richard H. Hicks, Los Angeles, Cal., for plaintiffs.

Kadison, Pfaelzer, Woodard & Quinn, Morris Pfaelzer & John J. Quinn, Jr., Los Angeles, Cal., for Spencer Haywood.

Wyman, Bautzer, Finell, Rothman & Kuchel by Frank Rothman, Beverly Hills, Cal., for First Northwest Industries.

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball & Robert Payson, Beverly Hills, Cal., for All-Pro Mgmt, Inc., Al Ross and Marshall Boyer.

McCutchen, Black, Verleger & Shea, G. Wm. Shea & Jos. R. Austin, Jr., Los Angeles, Cal., for National Basketball Assn.

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RESPECT TO CROSS-CLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION AGAINST CROSS-DEFENDANT NATIONAL BASKETBALL ASSOCIATION

FERGUSON, District Judge.

This matter came on for hearing on January 18, 1971, pursuant to the Court's Order to Show Cause re Preliminary In-

junction and Temporary Restraining Order and Order Shortening Time made on January 14, 1971, on the Motion of Cross-claimant Spencer Haywood ("Haywood") for a Preliminary Injunction Against the National Basketball Association ("NBA") as prayed for in his Motion for Temporary Restraining Order and for Order to Show Cause re Preliminary Injunction filed January 14, 1971. The Court, having considered the verified Amended Counter-claim and Cross-claim, the Affidavits in Support of the Motion and the Affidavits in Opposition Thereto, and having heard argument in open Court, and having considered all of the evidence presented in prior hearings in this matter, and having considered the Findings of Fact and Conclusions of Law proposed by Haywood, the written response of NBA to such proposed Findings and Conclusions and the Supplemental Proposals of Haywood, and having heard argument in open court on January 29, 1971, with respect to the form and content of such Findings and Conclusions, and having given careful study to the matter, and having made such revisions to the Findings and Conclusions proposed by each party as the Court has deemed proper, the Court makes the following—

### FINDINGS OF FACT

1. Haywood had been a spectacular basketball player while in high school in Detroit, Michigan, and was named as "All-Detroit", "All-Michigan" and "All-American" high school basketball player. Following graduation from high school in 1967, Haywood attended Trinidad Junior College, where he was a junior college "All-American" during the 1967–68 season. In the summer of 1968, he played on the U.S. Olympic Basketball Team, was named the outstanding player in the Olympic basketball games and led the United States team to victory and a gold medal. In the fall of 1968, Haywood enrolled at the University of Detroit where he played basketball during the 1968–69 season and was named an "All-American".

2. On or about August 16, 1969, Haywood and the Denver Rockets ("Denver"), a professional basketball team in the American Basketball Association ("ABA"), entered into a written contract whereby Haywood was employed by Denver as a skilled professional basketball player. He played as a member of the Denver team during the 1969–70 professional basketball season and was named "Rookie of the Year", and "Most Valuable Player in the ABA" for the 1969–70 Season. He led all other players in the ABA in scoring and rebounding. As a result of his performance during his first season as a professional basketball player, Haywood has become, in the parlance of the professional basketball industry, a "Super Star".

3. Prior to April 1, 1970, Haywood requested Denver to renegotiate the terms of his employment. During such negotiations Denver and Haywood agreed to rescind all prior employment agreements between them and Denver represented to Haywood that it would give Haywood a contract to play professional basketball for Denver for six years commencing October 1, 1970, for which services Haywood would receive total compensation in the amount of $1,900,000.

4. Haywood relied upon the representations of Denver and placed his trust in the managers of Denver who made such representations to him.

5. On April 1, 1970, Haywood, then not yet having attained the age of twenty-one (21) years, signed an ABA form of Uniform Player Contract with Denver. The contract provides for a term of employment of six years commencing on October 1, 1970, and provides for compensation in the amount of $47,000 for each of the first two years and $75,000 for each of the last four years.

6. On April 1, 1970, Haywood signed a written agreement with Ringsby Truck Lines, Inc. ("Ringsby"), which provides, among other things, that commencing on October 1, 1970, and on October 1 of each of the following nine years, Ringsby shall invest $10,000 in a "growth mu-

tual fund" under the "Dolgoff Plan"; that the investment fund so created shall remain the property of Ringsby, and that Haywood shall have no property right or interest in the fund; that Ringsby shall apply for life insurance on Haywood's life with death benefits of no less than $100,000 payable to such beneficiary or beneficiaries as may be designated by Haywood; that such life insurance shall be the sole property of Haywood; that Ringsby may use all or any portion of the investment fund as collateral for loans to Ringsby; that Ringsby shall have the right to liquidate the investment fund within its discretion to pay federal and state income taxes in respect of the fund and interest charges for loans made to Ringsby secured by the assets of the fund. The contract further provides that at any time after the payment of the last installment of $10,000 into the investment fund on October 1, 1979, Haywood shall have the right to direct payment to himself of an amount equal to ten percent (10%) of the then value of the investment fund as of the date on which he gives such direction; that on the anniversary of the giving of such direction, until the investment fund is exhausted, there shall be paid to Haywood an amount equal to ten percent (10%) of the value of the fund on the date such direction was given; that the right of Haywood to have any such payments made to him is conditioned upon his performing services to Ringsby during all of the period commencing October 1, 1970, and ending October 1, 1979; that as long as payments are made to Haywood from the investment fund Haywood shall "render advisory and consulting services to Ringsby"; that Haywood has no interest in the investment fund other than the right to receive payments from the fund and should he assign, pledge or mortgage his interest in the fund, all of the rights that are then vested in him shall terminate.

7. The Uniform Player Contract and the contract between Haywood and Ringsby (herein jointly referred to as "the contract") were also signed by Ben Gibson, as Haywood's guardian. Bernard E. Gibson, the same "Ben Gibson" who signed the contract as guardian of the Estate of Haywood, petitioned the Probate Court in and for the City and County of Denver and the State of Colorado, for an Order approving said proposed employment contract "for gross salary and compensation of $1,900,000 for said six-year period". On April 1, 1970, the Court ordered that Bernard E. Gibson be authorized to enter into and sign and execute "an employment agreement and agreements for the compensation of the minor ward of this Estate for his services as set forth in the Petition herein".

8. The contract does not provide for compensation for Haywood's services for six years in the amount of $1,900,000. Compensation in excess of $394,000 is illusory and indefinite.

9. On April 22, 1970, Haywood attained the age of twenty-one.

10. On or about June 8, 1970, Haywood signed a purported ratification of the contract. He did so believing that the contract provided the compensation which had been represented to him by Denver to be in the amount of $1,900,000, for services as a basketball player for six years.

11. In the fall of 1970, Haywood consulted an attorney the defendant Al Ross ("Ross"), who advised Haywood that the contracts did not provide for compensation in the amount of $1,900,000, and that they did provide for the rendition of services by Haywood to Ringsby beyond the expiration of the six-year term referred to in the Uniform Player Contract.

12. Professional basketball is the only trade in which Haywood can employ his unusual talents and skills. Unless Haywood plays professional basketball, those skills and talents will depreciate.

13. The only opportunity for a professional basketball player to use his skills and talents is as a player on a member team of either the ABA or the NBA. There are no other leagues of profes-

sional basketball teams of comparable status.

14. On November 23, 1970, Haywood gave written notice to Denver that he considered his contract with Denver to be invalid by reason of fraudulent misrepresentations made by Denver to him, and that he disavowed and rescinded said contract.

15. Haywood has refused to and continues to refuse to render services as a professional basketball player to Denver, and states that he will not under any conditions play basketball for Denver.

16. The validity of the Denver and Ringsby contracts is in dispute. The facts alleged by Haywood differ from the facts alleged by Denver. There is substantial probability that upon the trial of the main issue, the facts alleged by Haywood will be proven true.

17. Denver's First Amended Complaint filed in this action prays for a declaration that Haywood is obligated to play professional basketball for Denver during the 1970–71 to 1975–76 playing seasons inclusive; that Haywood may not play professional basketball for any other professional basketball team and for a preliminary and permanent injunction enjoining Haywood from breaching his contract with Denver. Denver's Motion for a Preliminary Injunction came on for hearing before this Court on January 8, 1971, and was denied. This Court made its Findings of Fact and Conclusions of Law in respect to such Motion and entered Judgment denying such Motion on January 20, 1971.

18. On December 28, 1970, Haywood contracted with the Seattle Supersonics ("Seattle"), a member team in the NBA, to play professional basketball for Seattle for six years.

19. At the time that, and before, Haywood entered into his contract with Seattle both Haywood and Seattle were aware that the application by NBA of its By-Law 2.05 would render Haywood ineligible to play in the NBA. Both Seattle and Haywood had been advised by their counsel of record in these proceedings that NBA's By-Law 2.05 violates the antitrust laws of the United States. Seattle refrained from including Haywood as a member of its player's roster until this Court had issued its Temporary Restraining Order on December 30, 1970.

20. The last peaceable, uncontested status which preceded the pending controversy existed at the time Haywood contracted to render his services to Seattle on December 28, 1970.

21. At the time that Haywood contracted to play professional basketball for Denver, the ABA had a four-year rule similar to that provided for in By-Law 2.05 of NBA. The ABA found that its four-year rule was a hardship on Haywood and waived it.

22. Haywood desires to play for Seattle and Seattle desires to have Haywood play for it.

23. On January 14, 1971, Haywood filed herein his First Amended Counter Claim and Cross Claim for Declaratory Relief and for Injunction and Damages under the Antitrust Laws. He alleges as a Second Cross Claim against NBA that the NBA and its member teams are engaged in an unlawful conspiracy to monopolize and restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 2 of the Sherman Act (15 U.S.C. § 2), and that unless NBA is restrained from applying its Constitution and By-Laws, Haywood will be prevented from playing professional basketball for Seattle during the remainder of the 1970–71 season as provided for in his contract with Seattle made on December 28, 1970.

24. NBA is an unincorporated association organized to operate and engage in the business of operating a league of professional basketball teams. There are 17 team members of NBA who are engaged in the business of operating professional basketball teams and who are designated in Haywood's First Amended Counter Claim and Cross Claim as co-conspirators. They are referred to therein and herein as the "NBA teams".

25. No professional basketball team can be a member of the NBA League unless it is a member of NBA and no member of NBA may engage in the business of professional basketball except in the NBA League.

26. The business of professional basketball as conducted by NBA and the NBA teams on a multi-state basis, coupled with the sale of rights to televise and broadcast the games for interstate transmission, is trade or commerce among the several States within the meaning of the Sherman Act.

27. The home cities of the 17 NBA teams include the seven most populous metropolitan areas in the United States and the home cities of all of the NBA teams are major metropolitan areas. NBA admits to its member teams the outstanding professional basketball players in this country. The quality of competition among NBA teams is superior to the quality of competition in the ABA.

28. Haywood contends that the NBA and the NBA teams have agreed with each other, combined with each other and conspired with each other in restraint of trade and commerce among the several states; and with the intent and for the purpose of restraining said trade and commerce, in violation of Section 1 of the Sherman Act as follows:

a. Cross-defendant NBA operates the principal major professional basketball teams and league in the United States.

b. Each player, on each team in the NBA, is required to sign a formal "Uniform Player Contract" which is identical in all respects, except salary and other matters related to compensation, with the contract signed by every other professional basketball player. The NBA and its teams, and each of them, do not permit anyone to play in any game, whether exhibition, championship or playoff, unless such a contract has been signed by such person. The terms of the contract are required by the NBA to be in the form prescribed by it. No player has the right to be a member of the Board of Governors of the NBA. No player has any right to participate in the creation of terms of said form contract. Pursuant to the said constitution and by-laws of NBA, every contract between a player and a team must be submitted to the NBA Commissioner. If said Commissioner disapproves of such a contract, which said Commissioner has the absolute and sole discretionary power to do, said contract is immediately terminated.

29. The constitution and by-laws of NBA contain extensive provisions relating to the method of obtaining, transferring and releasing professional basketball players, among which are provisions for the drafting of players who have not played professional basketball for NBA before; said provisions absolutely eliminate all competition for the services of the most talented, and hence the most valuable of such players: one team acquires the exclusive right to attempt to contract with such new players as each has drafted; no other club can compete for such services unless permitted by the drafting club so to do.

30. Section 2.05 of the by-laws of NBA provides as follows:

"A person who has not completed high school or who has completed high school but has not entered college, shall not be eligible to be drafted or to be a Player [in the NBA] until four years after he has been graduated or four years after his original high school class has been graduated, as the case may be, nor may the future services of any such person be negotiated or contracted for, or otherwise reserved. Similarly, a person who has entered college but is no longer enrolled, shall not be eligible to be drafted or to be a Player until the time when he would have first become eligible had he remained enrolled in college. Any negotiations or agreements with any such person during such period shall be null and void and shall confer no rights to the services of such person at any time thereafter."

31. Virtually every talented basketball player is drafted by one of the NBA teams, by agreement between them, at the NBA annual draft. The drafting team alone has the right to negotiate for such player's services, unless it assigns that right to another, in which case the assignee alone has such right. If the drafted player desires to play major league professional basketball in the NBA, he must contract with such team and no other. There is and can be no competition for such a player's services. Once the contract is signed by the player, no other team can contract with, or even attempt to contract with or negotiate with, said player. Each contract is for a term of at least one year. During that term, the player can play basketball for no other team unless he is released, sold or exchanged to another NBA team, in which case the player must play for such other team and no other.

32. George Gallantz, Esq., General Counsel to NBA, stated in open court on January 8, 1971, that the NBA conducts a player draft once each year, at which time each NBA member names the eligible players with whom it intends to attempt to enter into player contracts. The draft system is designed to maintain the various NBA teams, as nearly as feasible, at roughly equivalent levels of playing ability, so that the games played between league teams shall be as attractive as possible to spectators and others interested in the sport of professional basketball. Mr. Gallantz stated that the NBA By-Laws provide that at each annual player draft the weaker teams in the league (those with the poorest won-lost records during the preceding season) are to make the initial draft selections, and that based upon the current standings of the teams in the NBA, it is unlikely that Haywood would be available at the time Seattle exercises its first draft selection.

There is a substantial probability in light of all the evidence presented to this Court that the so-called "college draft" described by Mr. Gallantz to this Court on January 8, 1971, constitutes an arbitrary and unreasonable restraint upon the rights of Haywood and other potential NBA players to negotiate freely for the rendition of their services to NBA teams.

33. There is substantial probability in light of all the evidence presented to this Court that the so-called "college draft system" described in the preceding paragraph of these Findings of Fact constitutes a violation of the antitrust laws.

34. With respect to Haywood, Section 2.05 of the NBA by-laws, above quoted, has the effect of excluding him from the NBA until the commencement of the 1971–72 playing season. This provision prevents Haywood, a qualified professional basketball player, from contracting with any NBA team, even though he does not desire to, or may not be eligible to, attend college and even though he does not desire to, and is ineligible to, participate in collegiate athletics. There is a substantial probability in light of all the evidence presented to this Court, that the effect of this provision is a group boycott on the part of the NBA and its teams against otherwise qualified players who come within the terms of said provision, and that it is an arbitrary and unreasonable restraint upon the rights of Haywood and other potential NBA players to contract to play for NBA teams until the happening of an event (*i. e.*, the passage of four years from the graduation of a potential player's high school class) fixed by the NBA without the consent or agreement of such potential player.

35. There is a substantial probability in light of all the evidence presented to this Court, that NBA by-law 2.05 constitutes a group boycott as defined in Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). But for the application of that by-law provision of NBA to Haywood, Haywood would be eligible to play for Seattle or any other NBA team at this time.

36. There is a substantial probability in light of all the evidence presented to

this Court, that the provisions of Section 2.05 of the NBA by-laws and the provisions effectuating the NBA yearly draft, are in violation of the antitrust laws of the United States. Such provisions prevent a qualified basketball player from negotiating with two or more NBA teams at such time as the player desires in order to obtain the maximum monetary return available to such player. Instead, a qualified player has no right to negotiate with any NBA team until four years after his high school class graduation, and then can only negotiate with such NBA team as has obtained his draft rights. Thus, a restraint upon free trade in interstate commerce (in the form of an arbitrary and unreasonable restriction of the ability of qualified basketball players to bargain freely in a competitive market) is created by said provisions of the NBA by-laws and constitution, and by the conspiracy and conduct of the NBA and its teams, as aforesaid, to effectuate said group boycott.

37. The Commissioner has rejected Haywood's contract with Seattle, claiming that it is in violation of Section 2.05 of the by-laws. Since Haywood joined the Seattle team, every other team which has played against Seattle has protested each game in which Haywood either played or suited up for, regardless of whether Seattle won or lost said game.

38. On January 12, 1971, the Board of Governors of the NBA met and voted to seek drastic penalties against Seattle in a further effort to coerce Seattle not to permit Haywood to play.

39. The Commissioner of the NBA made statements to the news media also calculated to intimidate Haywood and Seattle and to prevent Haywood from playing, to wit, the Commissioner made the following statement:

"The Board of Governors, by a 15–2 vote, have passed a resolution directing the Commissioner with the aid of counsel to consider bringing charges against Seattle before the Board of Governors in connection with the Spencer Haywood matter and to advise the Board of the most drastic penalties lawfully at its command if such charges should be sustained. * * * This means expulsion of the franchise through various other levels, including fines, suspending draft choices."

40. A professional basketball player has a very limited career.

41. Participating in professional basketball as a player against the best competition which the sport has to offer is as necessary to the mental and physical well being of Haywood as is breathing, eating and sleeping.

42. Unless NBA is enjoined from enforcing its by-laws and particularly its by-law No. 2.05, Haywood will be unable to continue to play professional basketball for Seattle and NBA will take retaliatory action against Seattle which may include the suspension or revocation of Seattle's franchise as a member team of NBA.

43. If Haywood is unable to continue to play professional basketball for Seattle, he will suffer irreparable injury in that a substantial part of his playing career will have been dissipated, his physical condition, skills and coordination will deteriorate from lack of high-level competition, his public acceptance as a super star will diminish to the detriment of his career, his self-esteem and his pride will have been injured and a great injustice will be perpetrated on him.

44. The *only injury* to NBA which will follow from the granting of the Preliminary Injunction sought by Haywood is the uncertainty regarding the standing of the member teams of NBA during this playing season by reason of the inability of the Commissioner of the NBA to act upon the protests which have been filed and which may continue to be filed by teams against which Seattle has competed. If Haywood is ultimately successful and vindicates his eligibility, the Seattle team will be credited with its season's wins and losses in the normal manner. If, on the other hand, Haywood

is ultimately unsuccessful and it is determined that he was ineligible for NBA play, Seattle will forfeit the games won in which Haywood played (NBA By-laws § 2.08). In the latter case the standings would have to be readjusted if Seattle had won any games with Haywood as a player.

45. Any injury or inconvenience to the NBA which may result by reason of the granting of the Preliminary Injunction is self-imposed by reason of the substantial probability that any such injury would be caused by nonadherence to the antitrust laws of the United States.

46. The NBA draft of college basketball players will be held on March 29, 1971. This Court has adjusted its calendar to permit a trial on March 2, 1971, of all the issues raised by Denver's Amended Complaint, by Haywood's Amended Counter Claim and Cross Claim and by Seattle's Cross Claim for Declaratory Relief. The validity of Haywood's contract with Denver, the validity of Haywood's contract with Seattle and the question of whether Haywood is presently eligible to play in the NBA can be resolved prior to March 29, 1971, the date of the draft.

47. There is no evidence that the granting of the relief requested by cross-claimant will open the door to other allegedly ineligible college basketball players being recruited by NBA teams.

48. No monetary injury will result to the NBA by reason of the granting of the Preliminary Injunction.

49. On January 18, 1971, this Court considered and denied the Motion of NBA to suspend the Court's injunction, under Rule 62(c), pending an appeal from this Court's Order. In ruling on such Motion this Court once again balanced the equities and found that the irreparable injury to Haywood by reason of the denial of such relief far outweighed any injury which might be occasioned to NBA by the granting of it.

50. Any conclusion of law hereinafter recited which should be deemed a finding of fact is hereby adopted as such.

On the basis of the foregoing, the Court makes the following—

## CONCLUSIONS OF LAW

1. A preliminary injunction in this type of action should be granted where the plaintiff shows that: (1) the conduct to be enjoined is in furtherance of the alleged violation of the antitrust laws; (2) there is a substantial likelihood the allegations of the complaint will be sustained at the trial of the cause; (3) that irreparable harm to the plaintiff will result if the injunction pendente lite is denied; (4) and that there is no conduct by the plaintiff which would bar the granting of equitable relief. *See* Interphoto Corporation v. Minolta Corporation, 417 F.2d 621 (2d Cir. 1969), aff'g 295 F.Supp. 711 (S.D.N.Y.1969); Bergen Drug Company v. Parke, Davis & Company, 307 F.2d 725 (3d Cir. 1962); McKesson and Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa. 1964). *See also*, Ross-Whitney Corp. v. Smith Kline & French Lab., 207 F.2d 190 (9th Cir. 1953).

2. The conduct to be enjoined is in furtherance of the alleged violations of the antitrust laws.

3. Cross-claimant has established a substantial probability of success in the trial on the merits.

4. There is a substantial probability that By-law 2.05 of the By-laws of the Cross-defendant NBA constitutes a group boycott.

5. A group boycott is illegal per se and the reasonableness of it is no defense to its illegality.

6. Unless the relief prayed for is granted, Cross-claimant will suffer irreparable injury.

7. The possible injury which might inure to Cross-defendant NBA by reason of granting such relief is not irreparable and, when compared to the injury Cross-claimant would suffer were such relief not granted, is relatively slight.

8. There is no conduct by Haywood which would bar the granting of equitable relief.

9. The issuance of a preliminary injunction will maintain the status quo in this action.

10. Any Finding of Fact which should be deemed a Conclusion of Law is hereby adopted as such.

11. By reason of the foregoing Conclusions of Law the Preliminary Injunction should be granted.

12. The Court retains jurisdiction over the preliminary injunction involved herein and will consider, at any time, any new evidence which the NBA might present which is relevant to the propriety of continuing the preliminary injunction.

## MEMORANDUM OPINION GRANTING PARTIAL SUMMARY JUDGMENT

A part of this litigation is an antitrust claim brought by Spencer Haywood, a professional basketball player, against the National Basketball Association (hereinafter NBA), one of two major basketball leagues in the United States. Haywood filed a motion for partial summary judgment seeking an order of this court declaring Sections 2.05 and 6.03 of the by-laws of the NBA to be illegal under Section 1 of the Sherman Antitrust Act. 15 U.S.C. § 1.

Section 2.05 of the by-laws of the NBA provides as follows:

"*High School Graduate, etc.* A person who has not completed high school or who has completed high school but has not entered college, shall not be eligible to be drafted or to be a Player until four years after he has been graduated or four years after his original high school class has been graduated, as the case may be, nor may the future services of any such person be negotiated or contracted for, or otherwise reserved. Similarly, a person who has entered college but is no longer enrolled, shall not be eligible to be drafted or to be a Player until the time when he would have first become eligible had he remained enrolled in college. Any negotiations or agreements with any such person during such period shall be null and void and shall confer no rights whatsoever; nor shall a Member violating the provisions of this paragraph be permitted to acquire the rights to the services of such person at any time thereafter."

Section 6.03, while included in the by-laws as a part of the draft provisions, further defines eligibility for the NBA and reinforces the rule that a player cannot sign with an NBA team prior to four years after the graduation of his high school class. Section 6.03 provides as follows:

"*Persons Eligible for Draft.* The following classes of persons shall be eligible for the annual draft:

"(a) Students in four year colleges whose classes are to be graduated during the June following the holding of the draft;

"(b) Students in four year colleges whose original classes have already been graduated, and who do not choose to exercise remaining collegiate basketball eligibility;

"(c) Students in four year colleges whose original classes have already been graduated if such students have no remaining collegiate basketball eligibility;

"(d) Persons who become eligible pursuant to the provisions of Section 2.05 of these By-laws."

Except for Section 6.03, the other provisions of the player draft are not challenged by this partial summary judgment motion.

The NBA is an unincorporated association organized to operate, and engaged in the business of operating, a league of professional basketball teams. The NBA has 17 member teams, each located in a major metropolitan area. The NBA teams are engaged in the business of staging professional basketball exhibitions, and their principal source of rev-

enue arises from the sale of admission tickets and from the sale of the right to broadcast games by radio and television. Each of the member teams has agreed, in writing, to be bound by the provisions of the NBA constitution and by-laws.

Spencer Haywood is now a professional basketball player. Following graduation from high school in 1967, he attended Trinidad Junior College, where he was a junior college "All-American" during the 1967–68 season. In the summer of 1968, he played in the United States Olympic basketball games and led the United States team to a gold medal. In the fall of 1968, Haywood enrolled at the University of Detroit, where he played basketball during the 1968–69 season and was named an "All-American".

In the fall of 1969, Haywood entered into a contract with the Denver Rockets, a professional basketball team in the American Basketball Association (hereinafter ABA), pursuant to a "hardship" exemption from the ABA's four-year college rule. He played as a member of the Denver team during the 1969–70 season and was named "Rookie of the Year", and "Most Valuable Player in the ABA" for that season. Early in the 1970–71 season, a dispute arose between Denver and Haywood with regard to their contractual relations, and Haywood stopped playing for the Denver team. The status of the Denver-Haywood contract is presently the subject of litigation in this court.

Claiming that he had validly rescinded his Denver contract, Haywood signed a contract to play basketball with the Seattle Supersonics, a professional basketball team in the NBA. Walter Kennedy, the Commissioner of the NBA, disapproved Haywood's Seattle contract on the ground that Haywood was not yet eligible under the four-year college rule, and threatened sanctions by the NBA should he attempt to play. Haywood is presently playing basketball for the Seattle team under the provisions of a preliminary injunction issued by this court against the NBA pending final determination of this action.

The preliminary injunction was itself the subject of extensive litigation. The NBA appealed to the Ninth Circuit Court of Appeals, and that court stayed the injunction. Haywood then applied to Justice Douglas of the United States Supreme Court for a stay of the Ninth Circuit order. Justice Douglas, acting as Circuit Justice for the Ninth Circuit, decided "to allow the preliminary injunction of the District Court to be reinstated". *See* 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206. In doing so, he noted that basketball "does not enjoy exemption from the antitrust laws", and that the "group boycott issue in professional sports is a significant one". The Supreme Court, en banc, denied the NBA's motion to vacate the stay granted by Justice Douglas.

■    As noted by Justice Douglas, the Supreme Court has held that all professional sports, with the exception of baseball, are governed by the antitrust laws. Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955); Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

Stated simply, Section 2.05, in conjunction with Section 6.03, provides that no person is eligible as a player or for the draft, under any circumstances, until four years after his original high school class graduated. Applied to Spencer Haywood, these rules make him ineligible to play in the NBA until the commencement of the 1971–72 playing season, *i. e.*, four years after his 1967 high school graduation.

Haywood alleges that the effect of this provision is a group boycott on the part of the NBA and its teams against himself and other qualified players who come within those terms. The provisions prevent Haywood, a qualified professional basketball player, from contracting with

any NBA team, even though he does not desire to, or may not be eligible to, attend college and even though he does not desire to, and is ineligible to, participate in collegiate athletics.

Haywood also challenges the so-called "reserve clause" and the college draft, among other NBA provisions, as being similarly violative of the antitrust laws. However, those allegations are not subject to this partial summary judgment motion, and the court expresses no view with regard to the legality of those practices.

It should be pointed out initially that this case does not involve the question of whether Spencer Haywood is qualified to play basketball at the high level of competency required of NBA players. It is uncontested that he is so qualified. In fact, Haywood is now playing for the Seattle team. The sole question involved here is whether the NBA can prevent Haywood from playing in the NBA pursuant to his contract with Seattle until four years after his high school class graduated.

Application of the four-year college rule constitutes a "primary" concerted refusal to deal wherein the actors at one level of a trade pattern (NBA team members) refuse to deal with an actor at another level (those ineligible under the NBA's four-year college rule).

The harm resulting from a "primary" boycott such as this is threefold. First, the victim of the boycott is injured by being excluded from the market he seeks to enter. Second, competition in the market in which the victim attempts to sell his services is injured. Third, by pooling their economic power, the individual members of the NBA have, in effect, established their own private government. Of course, this is true only where the members' of the combination possess market power in a degree approaching a shared monopoly. This is uncontested in the present case.

The basic standard by which a motion for summary judgment is decided is derived from Fed.R.Civ.P. 56. Summary

judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law". A motion for summary judgment may be properly entertained at any time after the expiration of 20 days from the commencement of the action.

Rule 56 clearly authorizes summary adjudication which falls short of a final and complete adjudication, even of a single claim. *See generally*, 6 Moore's Federal Practice ¶ 56.20 [3.–2], at 2750–51. Rule 56(a) authorizes any claimant to move for a summary judgment in his favor as to "all or any part thereof" of his claim. Rule 56(c) provides for a summary judgment in favor of the claimant on the issue of liability, although the issue of damages must be tried because of a genuine factual issue. Finally, Rule 56(d) states that the court should, if the case is not fully adjudicated on the motion, direct "such further proceedings in the action as are just".

Summary judgments have been frequently used by the courts in group boycott cases. *See, e. g.*, Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In fact, group boycotts were specifically mentioned by the Supreme Court as one type of case which was appropriate for resolution without trial. White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). A partial summary judgment is similarly appropriate in antitrust cases. *See, e. g.*, United States v. Bausch & Lomb Optical Co., 3 F.R.D. 331 (S.D.N.Y.1943).

In response to Haywood's motion for partial summary judgment, the NBA argues three points: (1) There are disputed issues of material fact which make summary judgment improper; (2) summary judgment denies the NBA its right to a jury trial; and (3) this action is governed by the "rule of reason" and the NBA is entitled to prove that the rules involved do not "unreasonably restrain trade".

■ In support of its first contention, the defendant NBA points to what it al-

leges are several disputed issues of material fact. The first involves the present contractual litigation between Haywood and the Denver Rockets. Regardless of the outcome, the resolution of this matter is not determinative of Haywood's standing to maintain the present action. It is undisputed that the NBA's application of Sections 2.05 and 6.03 rendered Haywood ineligible to play in the NBA even before he entered into contractual relations with Denver and has continued to do so to the present time.

The NBA next asserts that "Mr. Haywood will suffer no injury by reason of the operation of the NBA 'draft'." Since this order is confined to the issue of the four-year college rule and does not reach the "draft" issue, this alleged dispute is not relevant for the purpose of this order. It is undisputed that application of the four-year college rule has rendered Haywood ineligible for NBA play. The NBA raises several "Other Disputed Material Facts" which are similarly unrelated to the four-year college rule and thus not material to the instant issue.

■ The NBA also argues that whether Haywood will suffer irreparable injury is a contested issue of material fact. The law governing the issuance of a permanent injunction in antitrust cases such as this requires the application of traditional equitable principles. 15 U.S.C. § 26. Therefore, if the NBA could show that Haywood had an adequate remedy at law a permanent injunction would not properly issue in this case. It therefore seems clear that this is a disputed issue of material fact, and a trial will be required to properly determine this issue. This does not, of course, bar partial summary judgment on the narrow issue presented here.

■ The NBA's second major argument is that even assuming *arguendo* that the by-laws are undisputed in their terms and in their application to Haywood and that a group boycott is *per se* illegal, Haywood is still not entitled to the requested partial summary judgment. The NBA bases this argument on its

right to a jury trial. However, it has long been held that a summary judgment does not infringe upon the right of a party to a jury trial. *See, e. g.,* Fidelity & Deposit Co. v. United States, 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194 (1902). Where no material fact is controverted, there is no issue triable by a jury and a summary judgment is proper.

Finally, the NBA argues that the "ultimate facts" concerning the four-year college rule, as alleged by Haywood, do not "constitute a group boycott and a *per se* restraint of trade". This argument is so intertwined with the "legal" issue of determining the antitrust law which is properly applicable in this case, that it must be discussed in that context.

■ Before a concerted refusal to deal can be illegal under Section 1 of the Sherman Act, two threshold elements must be present: (1) There must be some effect on "trade or commerce among the several States", and (2) there must be sufficient agreement to constitute a "contract, combination * * * or conspiracy". 15 U.S.C. § 1.

It is uncontested that both of these elements are present in the instant case. The NBA operates teams in seventeen of the major metropolitan areas of the United States. It schedules games in numerous states, and receives television and radio revenue from nationwide broadcasts of its games. It is thus clear that the NBA conducts its business in such a manner as to constitute interstate commerce. Furthermore, the members of the NBA have agreed, through their constitution and by-laws, not to deal with those persons described by Sections 2.05 and 6.03 of their by-laws.

Very early in the history of the antitrust laws, the Supreme Court was forced to decide whether the antitrust laws should be used to regulate the use of private aggregations of power or to prevent their existence altogether. Despite the fact that the literal language of Section 1 of the Sherman Act declares "every" combination in restraint of trade to be illegal, the Supreme Court, in

Standard Oil Co. v. United States, 221 U.S. 1, 31 .S.Ct. 502, 55 L.Ed. 619 (1911), ruled that the Sherman Act should be construed in the light of reason; and, as so construed, it prohibits only contracts and combinations which amount to an unreasonable or undue restraint of trade in interstate commerce. Thus, the "rule of reason" became the standard by which antitrust violations would be measured, and the Court undertook to regulate rather than prohibit private combinations. ·

The primary disadvantages of the "rule of reason" are that it requires difficult and lengthy factual inquiries and very subjective policy decisions which are in many ways essentially legislative and ill-suited to the judicial process. For instance, in the present case, a complex economic inquiry would be required to determine the economic necessity of action of this type. In addition, the court would be required to determine a standard which could be used to weigh the various public policy goals which might be alleged as justification by the NBA. The court would further be forced to determine whether the boycott was genuinely motivated by the purposes given, or by other reasons. Frequently, these motives are closely intertwined.

The Supreme Court has on numerous occasions recognized these difficulties and has declared that with regard to certain practices the problems of making adequate economic determinations and setting appropriate guidelines are so complex that they simply outweigh the very limited benefits deriving from those practices and have declared them to be illegal *per se*. A group boycott is one such practice.

"[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se*

unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable —an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, United States v. Addyston Pipe & Steel Co., 85 F. 271, [46 L.R.A. 122,] aff'd, 175 U.S. 211, [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, [68 S.Ct. 12, 92 L.Ed. 20]." Northern Pacific v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1957).

In Fashion Originators' Guild v. F.T.C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), a combination of manufacturers of women's garments and manufacturers of textiles used in garment making, sought to suppress competition by others who copied their designs. They did this by registering their designs and refusing all sales to manufacturers and retailers of garments who dealt in the copies. The Supreme Court affirmed the "cease and desist" order entered by the Federal Trade Commission. In doing so, the Court found no error in the refusal of the Commission to hear evidence on the reasonableness of the methods pursued by the combination. Such evidence "is no more material than would be the reasonableness of the prices fixed by the unlawful combination". 312 U.S. at 468, 61 S.Ct. at 708. The Court went on to note that even if

systematic copying of dress designs was tortious under the laws of all states, that circumstance would not justify a group boycott.

In Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), Klor's, a retail appliance dealer, brought a treble damage suit against a competing retailer, Broadway-Hale, and several manufacturers and distributors of appliances, alleging that Broadway-Hale had used its buying power to induce the others to stop dealing with the plaintiff. The defendants responded that it was purely a "private quarrel" between Klor's and the others and submitted affidavits to show that the boycott had no discernible effect on competition. The Supreme Court held that the concerted boycott by defendants violated the Sherman Act. The Court noted that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category". 359 U.S. at 212, 79 S.Ct. at 709.

These two cases have been frequently cited for the proposition that a concerted refusal to deal cannot be justified by any motive or ultimate goal, however reasonable. *See* Handler, Recent Developments in Antitrust Law: 1958–1959, 59 Colum.L.Rev. 843, 862–64 (1959). However, by its very nature the *per se* approach paints with a very broad brush and eliminates economic cooperation which may be both necessary and desirable. For this reason, lower courts have been reluctant to apply it and have frequently found reasons for not doing so. *See, e. g.,* Bridge Corp. of America v. American Contract Bridge League, Inc., 428 F.2d 1365, 1369–70 (9th Cir. 1970), petition for cert. filed, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1970).

The possibility that all concerted refusals to deal were not *per se* illegal was given considerable impetus in Silver v. New York Stock Exchange, 373 U.S. 341, 348–349, 83 S.Ct. 1246, 1252, 10 L.Ed.2d 389 (1963), where the Court recognized that a "justification derived from the policy of another statute or otherwise" might save a collective refusal to deal from *per se* illegality.

Silver, a securities dealer, while not a member of the New York Stock Exchange, maintained direct private telephone and tickertape connections with several members firms. Pursuant to Exchange rules, the member firms involved applied for approval of the connections. After granting temporary approval, the Exchange disapproved the applications and under the Exchange's constitution the member firms were then required to discontinue the services. This they did. Silver brought a treble damage suit, alleging that the cut-off was a concerted refusal to deal. The district court granted summary judgment in Silver's favor. The Second Circuit Court of Appeals reversed, on the grounds that the Securities Exchange Act, which gave the Commission the power of self-regulation, had exempted the Exchange from the restrictions of the Sherman Act.

The Supreme Court began by noting that "absent any justification derived from the policy of another statute or otherwise", the action of the Exchange would constitute a group boycott, *per se* illegal under the Sherman Act. The Court then stated that the exemption of the Exchange did not extend to action which could not "be justified as furthering legitimate self-regulative ends". In concluding that the self-regulation involved was not justified, the Court focused on the absence of notice and hearing prior to Exchange action.

Thus, *Silver* seems to envision the application of the *per se* rule to group boycott cases, with one narrow exception. A factual situation falling into this exception would be governed by the "rule of reason". To qualify for this exception it would have to be shown that:

(1) There is a legislative mandate for self-regulation "or otherwise". In discussing the history of the New York Stock Exchange in *Silver,* the Court suggests that self-regulation is inherently required by the market's structure. From this basis, it has

been argued that where collective action is required by the industry structure, it falls within the "or otherwise" provision of *Silver*. Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486 (1966).

(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary.

(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review.

The question then arises as to whether this court can, without a lengthy factual inquiry and a complex balancing of values, determine whether the present fact situation falls into the narrow exception which is governed by the "rule of reason". The importance of this question is obvious. If a trial court cannot do this, it will be required to evaluate all of the evidence and make all of the value judgments necessary to apply the "rule of reason" in order to determine whether the case falls into the exception. This would destroy the benefits of the *per se* approach.

This is, primarily, a question of the administration of the antitrust laws. For this reason, it should be remembered that the *per se* rule and the "rule of reason" constitute polar opposites on the spectrum of possible approaches.

The answer to this question is found in the Court's reasoning in *Silver*. There the Court focused on the issue of notice and hearing. According to the Court, the requirement of a hearing will, in itself, act as a check on illegitimate self-regulation. In addition, it will provide the antitrust court with a record from which it can determine whether the self-regulation is justified, necessary and sufficiently limited. "Hence the affording of procedural safeguards not only will substantively encourage the lessening of anticompetitive behavior outlawed by the Sherman Act but will allow the antitrust court to perform its function effectively." 373 U.S. 363, 83 S.Ct. 1260.

The *Silver* ruling explains the apparent inconsistency between the two ninth circuit decisions most similar factually to the present case. In Deesen v. Professional Golfers' Ass'n, 358 F.2d 165 (9th Cir.), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966), the circuit held that the Professional Golfers' Association's eligibility requirements for professional golf tournaments did not violate the antitrust laws. The PGA had terminated Deesen's approved tournament status only after a committee reassessed his performance against established standards; opportunities were also provided for Deesen to apply for reinstatement and to play "test rounds" in an effort to prove he was qualified for tournament play. The court found (a) that eligibility requirements were required by the industry structure, (b) that the requirements in question were intended to meet this goal, not improperly motivated, flexible and reasonably limited, and (c) that the procedural safeguards mentioned above were present.

On the other hand, in Washington State Bowling Prop. Ass'n v. Pacific Lanes, Inc., 356 F.2d 371 (9th Cir.), cert. denied, 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966), the court applied a *per se* rule to invalidate the regulatory scheme of the Bowling Proprietors Association of America. In this case, there was no provision for a hearing comparable to that found in *Deesen*. BPAA eligibility rules required that tournament bowlers restrict their league and tournament bowling to member establishments. The ostensible purpose was to prevent "sandbagging"—the inclusion of substandard scores in computing a bowler's average to gain a larger handicap. In holding the rules illegal, the court specifically rejected the defendant's argument that the *per se* rule applied only to commercial boycotts.

■ With regard to the facts of the instant case it can readily be determined that the case does not fall within the "rule of reason" exception provided by *Silver*. It is clear from the constitution and by-laws of the NBA that there is no provision for even the most rudimentary hearing before the four-year college rule is applied to exclude an individual player. Nor is there any provision whereby an individual player might petition for consideration of his specific case. Due to the lack of any such provisions, this court must conclude that on the basis of undisputed facts, the NBA rules in question fall outside the *Silver* exception and are subject to the *per se* rule normally applicable to group boycotts.

In addition, it is uncontested that the rules in question are absolute and prohibit the signing of not only college basketball players but also those who do not desire to attend college and even those who lack the mental and financial ability to do so. As such they are overly broad and thus improper under *Silver*. Summary judgment for violations of the antitrust laws is proper where less restrictive means than those used could have been employed. International Salt Co. v. United States, 332 U.S. 392, 397–398, 68 S.Ct. 12, 92 L.Ed. 20 (1947); International Business Machines Corp. v. United States, 298 U.S. 131, 139–140, 56 S.Ct. 701, 8 L.Ed. 1085 (1936).

■ Throughout the briefs and affidavits of the NBA, there is the suggestion that the purpose of the rules in question removes those rules from the normal coverage of the antitrust laws. Three reasons have been suggested for having the four-year college rule. First, the NBA has suggested that it is financially necessary to professional basketball as a business enterprise. It seems clear from *Klor's* that this does not provide a basis for exemption from the antitrust laws with regard to group boycotts, unless it qualifies under the ruling of *Silver*. As discussed earlier, *Silver* does not exempt the present rules from illegality.

■ A second reason given by the NBA is that this type of regulation is necessary to guarantee that each prospective professional basketball player will be given the opportunity to complete four years of college prior to beginning his professional basketball career. However commendable this desire may be, this court is not in a position to say that this consideration should override the objective of fostering economic competition which is embodied in the antitrust laws. If such a determination is to be made, it must be made by Congress and not the courts.

■ Finally, Haywood has suggested that at least one of the reasons for the four-year college rule is that collegiate athletics provides a more efficient and less expensive way of training young professional basketball players than the so-called "farm team" system, which is the primary alternative. Even if this were true, it would not, of course, provide a basis for antitrust exemption.

Pursuant to the requirement of Fed.R. Civ.P. 56(d), the court finds that the following material facts are not in dispute:

(1) The NBA conducts its business in such a manner as to constitute interstate commerce.

(2) The member teams of the NBA have conspired not to deal with persons whose high school classes are not four years beyond graduation.

(3) The NBA has applied Sections 2.05 and 6.03 of its by-laws so as to render Spencer Haywood ineligible to play in the NBA.

(4) The NBA does not provide procedural safeguards whereby an individual may contest his exclusion under Sections 2.05 and 6.03.

(5) Sections 2.05 and 6.03 impose an absolute exclusion on all persons whose high school class has not been graduated for more than four years.

By reason of these undisputed facts, and for the reasons stated above, the court orders that partial summary judgment in favor of plaintiff Haywood be

granted, to the limited extent of ruling that the NBA's four-year college rule—as embodied in Sections 2.05 and 6.03—is a violation of Section 1 of the Sherman Act. The court does not make any ruling at this time with regard to what remedy might be appropriate in light of this illegality.

Due to the fact that this action has not been fully adjudicated on this summary judgment motion, Rule 56(d) requires the court to direct "such further proceedings in the action as are just". As set forth herein, the issue of whether permanent injunctive relief, monetary damages, or both, are appropriate must be determined at a later date following a full evidentiary hearing. This determination should be in conjunction with the trial of the other antitrust issues raised by the complaint. In order to maintain the status quo and prevent irreparable harm, the preliminary injunction already issued in this case will continue in effect pending the final determination of this action.

Pursuant to the provisions of Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum opinion shall constitute the findings of fact and conclusions of law of the court.

Pursuant to the provisions of Rule 58, a judgment shall be entered as follows:

"1. Sections 2.05 and 6.03 of the by-laws of the National Basketball Association are declared to be illegal under Section 1 of the Sherman Act. 15 U.S.C. § 1.

"2. The preliminary injunction granted by this court on February 2, 1971, will remain in full force and effect pending final determination of all matters raised by the crossclaim. That injunction reads as follows:

'IT IS ORDERED AND ADJUDGED that Cross-defendant NBA, its members, officers, agents, servants, employees, attorneys and all persons in active concert or participation with them, pending the final hearing and decision in this action, are enjoined from applying the Constitution, By-laws, Rules and Regulations of the NBA in any manner so as to prevent or interfere with, or from taking any other action, directly or indirectly, to prevent or interfere with Cross-claimant Haywood playing professional basketball as a player on the playing roster of the Seattle Supersonics. Nothing in this order shall prevent the NBA from sanctioning Haywood in the normal manner for improper behavior unrelated to the subject matter of this suit.'

"3. The court retains jurisdiction to enforce the provisions of this judgment, for the purpose of issuing orders to clarify, modify, or amend any of the provisions hereof, and for all other purposes."