UNITED STATES v. BAUSCH & LOMB
OPTICAL CO. et al.

District Court, S. D. New York.

Jan. 15, 1943.

Samuel S. Isseks and Irving B. Glick-feld, Sp. Assts. to Atty. Gen., and Melville C. Williams, Sp. Atty., of New York City, for the United States.

Simpson Thacher & Bartlett, of New York City (Whitney North Seymour, Francis X. Fallon, Jr., and Robert E. Watkins, all of New York City, of counsel), for defendants Bausch & Lomb Optical Co. et al.

Root, Clark, Buckner & Ballantine, of New York City (John E. F. Wood, of New York City, of counsel), for defendants American Optical Co. et al.

LEIBELL, District Judge.

The Government's motion for a partial summary judgment, or in the alternative for a preliminary injunction, is denied. It is the second motion of this kind made by the Government in this suit instituted "against the above named defendants in order to prevent violations by them jointly and severally of Sections 1 and 3" of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 3. The first motion was heard by Judge Goddard of this Court in July 1942. He granted a partial summary judgment holding unlawful certain sublicenses, issued by the defendant Panoptik Company, Inc. to wholesalers and retailers of its bifocal lenses, fixing their resale prices. These and certain administrative provisions of the wholesale and retail sublicenses clearly established them as the framework of an unlawful distribution system, in restraint of interstate trade. The sublicenses fell under the ban of the United States Supreme Court's decision in the case of United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408.

On the motion heard by Judge Goddard, the Government sought a ruling that the sublicenses to the wholesalers and retailers were the result of a conspiracy, to which all of the defendants were parties, and that

"the provisions in the manufacturing licenses dated October 30, 1934, and any supplemental or amendatory agreement relating thereto, between defendant Panoptik Company, Inc., and defendant, American Optical Company and between defendant Panoptik Company, Inc., and defendant, Bausch & Lomb Optical Company which have a bearing upon, or in any way relate to, the execution or enforcement of the said sublicense agreements between defendant Panoptik Company, Inc., and the optical wholesalers and retailers are unlawful and in violation of Sections 1 and 3 of the Sherman Act".

The defendant corporations did not object to the entry of a decree declaring the wholesale and retail sublicenses issued by Panoptik unlawful and granting an injunction restraining the defendants from enforcing the provisions thereof or from entering into similar sublicense agreements thereafter. One of the corporate defendants, American Optical Company, was also willing that certain provisions of the manufacturing license issued by Panoptik to American Optical, to wit, paragraphs 15 and 16 and part of the first sentence of paragraph 17 (relating to the sublicenses issued to wholesalers and retailers) should be similarly adjudged unlawful and action thereunder enjoined. (The paragraphs are set forth on a sheet annexed to this opinion.) [1] The defendant, Bausch & Lomb, contended before Judge Goddard that the Court could not deal piecemeal with the provisions of the manufacturing licenses issued by Panoptik, that each manufacturing license should be dealt with in its entirety, and should stand or fall as a whole. In its proposed decree submitted to Judge Goddard the Government went beyond the scope of its notice of motion and sought to have all of paragraph 17 of the manufacturing licenses issued by Panoptik to American Optical and to Bausch & Lomb declared unlawful and void, and to have an injunction issued accordingly.

Judge Goddard ruled that he would not pass upon the issue of conspiracy on the

---

[1] 15. The Licensee's right to sell Panoptik lens blanks and lenses under said patent rights shall be restricted to sales to parties holding licenses under said patent rights from the Licensor in the form of "Agency", "AA", "A" or "Rx" licenses attached hereto or as such licenses shall be changed from time to time. The form of such licenses shall not be changed without consent of the Licensee. The Licensee agrees that it will not sell lens blanks and/or lenses manufactured hereunder, except to such parties having such licenses, and under the terms and conditions stated in such licenses, except that lenses and lens blanks may also be sold to parties holding a manufacturing license from Licensor.

16. The Licensor agrees that, upon the written request of Licensee, it will grant licenses in the form of "Agency", "AA" and "Rx" as hereto annexed or in such form as may be in effect at the time of such request, to any party acceptable to Licensor who may qualify under the terms of each said license; provided, that, in case the Licensee shall request the issuance of any such license to any party and the Licensor shall hold such party unacceptable, no request by any other licensee for the issuance of a license to the same party shall be granted by the Licensor without the written consent of the Licensee hereunder.

17. The Licensee agrees that it will sell rough lens blanks and semi-finished blanks and finished lenses embodying or made in accordance with the inventions covered by any of said patent rights to parties holding "Agency", "AA", "A" and "Rx" licenses at prices not less than and on terms of sale no more favorable than those prescribed by the Licensor. Minimum prices and most favorable terms, as prescribed by the Licensor, are set forth in Schedule 1 attached hereto. The Licensor reserves the right, at any time and from time to time, to change said schedule or any part thereof, but only with the consent of the Licensee, and any new or changed schedule, when issued by the Licensor and approved by the Licensee, shall be substituted for and replace the previously established schedule, and become a part of this license agreement as fully as if the same had been originally attached thereto. The Licensee covenants and agrees that in its sales hereunder it will conform in all respects to the terms of said Schedule 1, or of such schedule or schedules as may be substituted therefor pursuant to the terms hereof, and that it will not attempt to evade the same by the grant of any rebates, by placing goods on consignment, by selling other goods to purchasers of the lens blanks and/or lenses made hereunder at lower than its regular prices for such other goods or by any other device or expedient; and the violation of the provisions of this paragraph shall give the Licensor the right, at its option, to cancel and terminate this license.

motion submitted to him. He held that the wholesale and retail sublicenses issued by Panoptik were contracts in restraint of trade, unlawful, null and void. But he made no ruling on any of the provisions of the manufacturing licenses issued by Panoptik to American Optical Company and to Bausch & Lomb Optical Company. The issues in respect to the manufacturing license agreements, as well as the issue of conspiracy, were reserved for the trial of the action.

On the present motion the Government asks "for a summary judgment in part, pursuant to Rule 56 of the Rules of Civil Procedure [28 U.S.C.A. following section 723c], or, in the alternative, a preliminary injunction, pursuant to Section 4 of the Sherman Act, 15 U.S.C.A. § 4, on the ground that the defendants have entered into cross-license agreements of competing patents which fixed prices"; and declaring (1) that the corporate defendants have conspired to restrain interstate trade and commerce in ophthalmic lenses by fixing prices, terms and conditions of sale of "Ful-Vue" and "Panoptik" lenses; and (2) declaring that the agreement of October 30, 1934, whereby the Panoptik Company licensed the two other corporate defendants to manufacture and sell "Panoptik" lenses under patents controlled by Panoptik Company, Inc., and another agreement, also dated October 30, 1934, whereby American Optical Company licensed Bausch & Lomb to manufacture and sell "Ful-Vue" lenses under patents owned by American Optical Company, are unlawful and in violation of Sections 1 and 3 of the Sherman act and should be cancelled. (3) An injunction restraining the corporate defendants from adhering to or enforcing said cross-license agreements and from making any such licenses or agreements in the future is also sought.

The contention that the manufacturing license agreements are unlawful is based principally on paragraphs 15, 16 and 17 of the Panoptik licenses and paragraph 12 of the American Optical license. But paragraphs 15 and 16 of the Panoptik license agreement have in effect been nullified by the judgment entered on Judge Goddard's decision declaring unlawful the wholesale and retail sublicenses. The same is true of part of the first sentence of paragraph 17. The alleged illegality of the balance of paragraph 17 of the Panoptik license

fixing manufacturers' sale prices (which is similar to the provisions of paragraph 12 of the manufacturing license issued by American Optical) was squarely placed before Judge Goddard by the Government's proposed judgment and the effect of his decision was to reserve that issue for the trial. The patents for "Ful-Vue" lenses expired July 7, 1942 and the license to manufacture "Ful-Vue" lenses issued by American Optical Company to Bausch & Lomb Optical Company terminated with the patent. This is probably the reason why no relief in respect to said agreement was sought on the motion before Judge Goddard.

■ By the present motion the Government really asks that the determination of Judge Goddard and the provision of his decree—"that the remaining issues upon the complaint and answers be and they hereby are reserved for trial and the entry of this decree is without prejudice to the determination thereof"—should be reconsidered by this Court. The reason given is the fact that the trial of the action will be postponed for the duration of the war, on a request of the Secretary of the Army and the Secretary of the Navy addressed to the Attorney General of the United States. Apart from the question of the right of a party to make more than one motion for a summary judgment under Rule 56, F.R.C.P. (which is not recognized in the New York State Courts under a like rule, Rule 113 of the Rules of Civil Practice; Edora Garment Co. v. Rothman, July 6, 1934 [2]) it is my opinion that the reason given for this second application is insufficient and that there are strong reasons for holding to the decision of Judge Goddard that the remaining issues should be judicially determined after a trial.

■ The issue of conspiracy cannot be determined properly from the few documents submitted by the Government on this motion. In their answering affidavits, the defendants have shown that there are many facts to be considered, on which extensive testimony should be taken at the trial, all of which will have a bearing on the issue of conspiracy. The defendants argue that the cross licenses on the patents of Panoptik and American Optical were made in good faith for a lawful purpose, that questions of infringement and the extent and scope of the patents had aris-

---

[2] No opinion for publication.

en which the respective parties, American Optical and Panoptik Company (a wholly owned subsidiary of Bausch & Lomb Company) sought to adjust by the cross-licensing arrangement. Price fixing of the manufacturer's product under a license from the patent owner was held not unlawful in United States v. General Electric Co. et al., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. Of course, agreements legal on their face, may be used as part of an unlawful conspiracy to violate the provisions of the Sherman Anti-Trust Act. But to so hold requires an inquiry into relevant facts as to the real intention of the parties and the effect of their acts. Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. Practically every cited case under the Sherman Anti-Trust Act involved a trial of the issues of fact.

The statement set forth in the Government's brief as to what it considers would be proper provisions for a decree to be entered after a finding that the manufacturing licenses were unlawful and the result of a conspiracy of the corporate defendants, emphasizes the need for a thorough inquiry by the Court into all the surrounding facts and circumstances—of the manufacture of lenses under the original patents, the competition between the defendant corporations, the claims made of infringement, and the bona fides of the asserted dispute that led up to the negotiation of the cross-licenses. The extent of the hardships that might be imposed in any such decree against the corporate defendants, would depend upon the evidence developed at the trial. Many genuine issues of material facts are clearly presented for a trial court and under Rule 56, F.R.C.P., a partial summary judgment cannot be granted when that is shown.

I believe that the real evil, so far as the general public is concerned, was in the wholesale and retail distribution system and the price-fixing provisions and schedules of the sublicenses. An examination of the schedule of prices discloses that the fixed price at which the manufacturer could sell the lens blanks was a comparatively small part of the total cost of bifocal lenses to the general public. The balance was taken up by the wholesalers and retailers. The decree made by Judge Goddard has removed the most harmful effects of the defendants' practices.

The need for a temporary injunction in respect to the remaining effective provisions of the manufacturing licenses is not shown. The Ful-Vue patent owned by the American Optical Company expired July 7, 1942. The patents of which Panoptik is the exclusive licensee have some years to run. The cross-license situation no longer exists. This has some bearing on the question of the necessity for an injunction herein. Injunctions are not issued as a penalty for past offenses but to prevent a continuance or a recurrence of unlawful practices. United States v. Aluminum Co. of America, D.C., 44 F.Supp. 97, at page 245.

An injunction affecting the manufacturing licenses would enure to the benefit of Bausch & Lomb and the Panoptik Company at the expense of the American Optical Company. Bausch & Lomb has had the use of the license on the patent for the "Ful-Vue" lens of the American Optical Company, during the life of that patent. As the owner of all the capital stock of Panoptik, we may assume that Bausch & Lomb would have no difficulty in continuing to manufacture bifocal lenses under the patents covering the "Panoptik" lenses and of course could use the process of the expired "Ful-Vue" patent. Little harm would be done to Bausch & Lomb by such an injunction. In fact, from the record of the argument before Judge Goddard, it appears that Bausch & Lomb were not unmindful of the advantages to them and the disadvantages to American Optical, of an injunction that would strike down the existing manufacturing licenses from Panoptik to each of them. If the judge presiding at the trial should decide that the Government is entitled to some form of injunction affecting the manufacturing licenses issued by Panoptik, he will be in a better position, having heard the evidence, to determine what the provisions of the injunction should be.

For the foregoing reasons I am of the opinion that the Government's motion should be denied in its entirety. Submit order accordingly, on two days' notice.