Barbara Jane **BLALOCK**, Plaintiff,

v.

**LADIES PROFESSIONAL GOLF AS-SOCIATION et al.,** Defendants.

Civ. A. No. 16683.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 21, 1973.

Anderson, Allegaert & Russell, Jerald Oshinsky, New York City, Powell, Goldstein, Frazer & Murphy, E. G. Partain, Atlanta, Ga., for plaintiff.

Smith, Cohen, Ringel, Kohler, Martin & Lowe, Hoke Smith, Atlanta, Ga., Anderson, Henley, Shields, Bradford & Pritchard, C. A. Searcy Miller, Dallas, Tex., for defendants.

**1262**

## ORDER OF COURT

MOYE, District Judge.

This case is before the Court on plaintiff's motion for partial summary judgment, defendant Erickson's motion for summary judgment and defendant McCauliff's motion for summary judgment. The Court heard oral argument on these motions on January 4, 1973, and supplemental briefs were subsequently filed on February 26, 1973, and March 2, 1973. The Court will consider the motions *seriatim*.

■ Plaintiff has moved for a partial summary judgment[1] on the ground that her one-year suspension from defendant Ladies Professional Golf Association [hereinafter LPGA] is illegal under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

The pleadings, affidavits and depositions on file in this case disclose the following:

Plaintiff and defendants Cynthia Sullivan, Judy Rankin, Linda Craft, Penny Zavichas and Sharon Miller are professional women golfers who regularly compete against one another in tournament play sponsored by defendant LPGA for profit. Plaintiff and these defendants are all active members of defendant LPGA which is organized under the laws of the State of Ohio and is the sole owner of the defendant LPGA Tournament Players Corporation, a Texas corporation which was organized for carrying on the business matters of defendant LPGA. The officers of defendant LPGA and defendant LPGA Tournament Players Corporation are the same. The policies, business and affairs of defendant LPGA are directed by the Executive Board, which is comprised of defendants Sullivan, Rankin, Craft, Zavichas and Miller, who are officers of defendant LPGA as well as player-competitors of plaintiff.

During the week of May 15, 1972, defendant Gene McCauliff III, Tournament Director of defendant LPGA, appointed four observers at the second round of the LPGA Tournament in Louisville, Kentucky, to observe the play of the plaintiff. The observers claimed that plaintiff had illegally moved her ball. A meeting of the Executive Board of defendant LPGA was convened on May 20, 1972, which resulted in a decision to disqualify plaintiff as to the Louisville tournament, to place her on probation for the remainder of the 1972 season and to impose a fine of $500 for cheating. Plaintiff was informed of the Executive Board's decision on May 26, 1972, when she was summoned before the Executive Board in Southern Pines, North Carolina.

On May 28, 1972, the Executive Board again convened to discuss plaintiff's case. The meeting was attended by two non-Board members—Marlene Hagge and Kathy Farrer—both player-competitors of plaintiff. Defendants Sullivan and Rankin related that plaintiff had made certain statements on May 26, 1972, when informed of her probation and fine which were considered by them to be admissions of her improper conduct. Marlene Hagge, speaking on behalf of the tournament committee, recommended that plaintiff be suspended. The members of the Executive Board who were present (defendants Sullivan, Rankin and Miller) discussed the suspension of plaintiff and voted to suspend plaintiff for one year. Defendant Craft in Baltimore, Maryland, was called, and, after the case was explained to her, she, too, cast her vote for suspension. Defendant Zavichas, who was in Colorado, was unable to be reached.

1. Summary judgments may be appropriate in group boycott cases. *See* Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). A partial summary judgment likewise may be appropriate. *See, e. g.*, Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971); United States v. Bausch & Lomb Optical Co., 3 F.R.D. 331 (S.D.N.Y.1943).

On May 30, 1972, plaintiff was again called before the Executive Board which had convened in Baltimore, Maryland. All members of the Executive Board were present. After extended discussion with plaintiff, the Executive Board informed plaintiff that she was suspended from June 1, 1972, until May 31, 1973. That suspension was agreed to by all members of the Executive Board.

Plaintiff contends that suspension from defendant LPGA for a period of one year constitutes a group boycott and a *per se* restraint of trade.

■ Initially, it must be pointed out that professional golf is subject to the antitrust laws. Although not expressly deciding that professional golf is so governed, Justice Blackmun, in Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L. Ed.2d 728 (1972), having determined that baseball is exempt from the antitrust laws, stated that:

" . . . Other professional sports operating interstate—football, boxing, basketball, and, presumably, hockey and golf—are not so exempt . . . ." [footnotes omitted] [407 U.S. at 282–283, 92 S.Ct. at 2112]

That professional golf is governed by the antitrust laws is further substantiated by Deesen v. Professional Golfers Ass'n of America, 358 F.2d 165 (9th Cir. 1966), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).

■ Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ."

Before a concerted refusal to deal can be illegal under this section, two threshold elements must be present: (1) there must be some effect on "trade or commerce among the several States", and (2) there must be sufficient agreement to constitute a "contract, combination . . . or conspiracy." *See* Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1062 (C.D.Cal.1971).

It is undisputed that both of these elements are present in the instant case. As to the first element, it is clear that defendant LPGA conducts its business in such a manner as to constitute interstate commerce. The golf tournaments, co-sponsored by defendant LPGA Tournament Players Corporation, are conducted in and among the several states and the rights to televise and broadcast certain tournaments for interstate transmission have been sold. As to the second element, defendants Sullivan, Rankin, Craft, Zavichas, Miller and the members of the LPGA, by the imposition of a one-year suspension, have agreed, through the LPGA's constitution and by-laws, not to deal with plaintiff.[2]

■ The fundamental principle for determining the legality of conduct under the Sherman Antitrust Act is the "rule of reason" announced in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). *E. g.*, E. A. McQuade Tours, Inc. v. Consolidated Air Tour, Man. Com., 467 F.2d 178, 185 (5th Cir. 1972) [hereinafter *McQuade*]; Harrison v. Prather, 435 F.2d 1168 (5th Cir. 1970), cert. denied, 404 U.S. 829, 92 S.Ct. 67, 30 L.Ed.2d 58 (1971). Justice Brandeis explained the rule of reason in Chicago Board of Trade v. United States, 246 U. S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), wherein he stated that:

" . . . Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and

2. Defendants argue that they did not, by their suspension of plaintiff, initially exclude anyone from membership or participation in their organization. Defendants do not dispute that the suspension amounts to an agreement among the defendants to refuse to deal with plaintiff for a year; however, they argue that this was not a *primary* refusal to deal.

perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. . . ." [246 U.S. at 238, 38 S.Ct. at 244]

From this general principle has been carved a well-defined exception within which fall group boycotts:

". . . Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. *See* Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Once the existence of such an arrangement has been established, no evidence of actual public injury is required, Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), and no evidence of the reasonableness of defendant's conduct will be considered in justification. *See* Northern Pacific, *supra.* This rule of *per se* illegality has been applied thus far to horizontal and vertical price fixing agreements,[9] divisions of mar-

"[9]. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502 (1911) (vertical) ; United States v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (horizontal).

kets between competitors,[10] tying

"[10]. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

arrangements,[11] *and certain collective*

"[11]. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

*refusals to deal, or 'group boycotts.'* [12]

"[12]. Fashion Originators Guild of America v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941)."

[emphasis added] [*McQuade, supra,* 467 F.2d at 186]

The United States Court of Appeals for the Fifth Circuit in *McQuade* discussed the cases holding collective refusals to deal, or group boycotts, to be illegal *per se* and concluded that these cases fall into three categories:

". . . The first group, exemplified by Eastern States Retail Lumber Dealers Assoc. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), have involved horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market. Thus, in *Eastern States*, a combination of retail lumber dealers black-listed lumber wholesalers who sold directly to the retailers' customers. The obvious purpose of the combination—eliminating competition from the wholesalers—placed it 'within the prohibited class of undue and unreasonable restraints.' 234 U.S. at 612, 34 S.Ct. at 954. To the same effect are Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) ; Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) ; and Thill Securities Corp. v. New York Stock Exchange, 7th Cir. 1970, 433 F.2d 264, cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).

"Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), illustrates a second category of group boycott cases, involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination. For example, in *Klor's,* a large appliance dealer, Broadway-Hale, used its purchasing power to induce defendant manufacturers and wholesalers to sell only at discriminatory prices to plaintiff, a competing appliance dealer. Since the effect of the agreement was to drive Klor's out of competition with Broadway, the Court found the three-cornered agreement illegal *per se,* notwithstanding the fact that the manufacturers and wholesalers, not in competition with Klor's probably had no such anti-competitive motive. *See also* Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656,

81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 5th Cir. 1966, 365 F.2d 478.

"Unlike these first two categories, the third group of cases has concerned combinations designed to influence coercively the trade practices of boycott victims, rather than to eliminate them as competitors. The leading case in the area is Fashion Originators Guild of America v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), in which a group of 'original' designers refused to sell their creations to retailers who purchased and sold copies of the original designs. In holding this refusal to deal illegal *per se*, the Court declared that even though the object of the boycott was to prevent the retailers from dealing with manufacturers of the copies and thereby eliminate 'style piracy,' the coercion practiced indirectly on a rival method of competition precluded application of the rule of reason. *See also* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L. Ed. 219 (1951) (liquor manufacturers' collective refusal to sell to price-cutting wholesalers)." [467 F.2d at 186–187]

The Court of Appeals then synthesized the holdings of the cases reviewed by it as follows:

"In all of these cases, the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade,' and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se* rule has not been applied to collective refusals to deal . . . We conclude that resort to the *per se* rule is justified only when the presence of exclusionary or coercive conduct warrants the view that the arrangement in question

is a 'naked restraint of trade.' Absent these factors, the rule of reason must be followed in determining the legality of the arrangement. *See* Von Kalinowski, The Per Se Doctrine—An Emerging Philosophy of Antitrust Law, 11 U.C.L.A. L.Rev. 569 (1964); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L. Rev. 47 (1955)." [467 F.2d at 187]

Measured by the standard set forth in *McQuade, supra,* the Court finds that the purpose and effect of the arrangement in this case (the agreement by defendants Sullivan, Rankin, Craft, Zavichas and Miller to suspend plaintiff from defendant LPGA for one year) was to exclude plaintiff from the market and is therefore a "naked restraint of trade." Plaintiff is a member in good standing of defendant LPGA. Suspension therefrom is tantamount to total exclusion from the market of professional golf. Not only would plaintiff be excluded from LPGA sponsored tournaments, but, as defendant LPGA's Constitution and By-Laws provide in Article VIII,"

"A member of the Ladies Professional Golf Association may not compete for prize money in tournament, professional-amateur, or qualifying event that is not co-sponsored by the LPGA Tournament Players Corporation, or approved in writing by the LPGA Executive Director . . . . ."

The suspension was imposed upon plaintiff by defendants Sullivan, Rankin, Craft, Zavichas and Miller in the exercise of their completely unfettered, subjective discretion as is evident from the fact that they had initially imposed upon plaintiff only probation and a fine, but then, without hearing from plaintiff, determined to impose the suspension at issue here. Furthermore, the suspension was imposed by competitors of plaintiff who stand to gain financially from plaintiff's exclusion from the market.

The Court therefore determines that the arrangement in this case is illegal

*per se.* Consequently, it is not necessary that it inquire as to the reasonableness of the suspension. *See* Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Fashion Originators Guild of America v. F.T.C., *supra; McQuade, supra,* 467 F. 2d at 186.

Defendants have argued throughout their briefs that the instant case is governed by the "rule of reason" on the ground that the suspension of plaintiff was a valid exercise of self-regulation. Defendants principally rely on the case of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Silver, a securities dealer, though not a member of the New York Stock Exchange, maintained direct private telephone wire connections with several member firms. Pursuant to the Exchange's rules, the member firms involved applied to the Exchange for approval of the connections. After granting temporary approval for the connections as well as for a direct teletype connection and stock ticker service, the Exchange, without prior notice to Silver, disapproved the applications and under the Exchange's constitution the member firms were then required to discontinue the services. The Exchange refused to disclose to Silver the reasons for such actions. Silver brought an antitrust suit, alleging that the cut-off was a collective refusal to deal. The district court granted summary judgment in Silver's favor. The Second Circuit Court of Appeals reversed on the ground that the Securities Exchange Act, which gave the Commission and the Exchange disciplinary powers over members of the Exchange, exempted the Exchange from the restrictions of the Sherman Act.

The Supreme Court granted certiorari and in reversing the Second Circuit began its opinion by stating:

"It is plain, to begin with, that removal of the wires by collective action of the Exchange and its members would, had it occurred in a context free from other federal regulation, constitute a *per se* violation of § 1 of the Sherman Act. The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market. . . *Hence, absent any justification derived from the policy of another statute or otherwise, the Exchange acted in violation of the Sherman Act.* In this case, however, the presence of another statutory scheme, that of the Securities Exchange Act of 1934, means that such a conclusion is only the beginning, not the end, of inquiry." [emphasis added] [373 U.S. at 347–349, 83 S.Ct. at 1252]

The Court determined that the Securities Exchange Act of 1934 mandated that the Exchange exercise self-regulation, but rejected the Court of Appeals' conclusion that the particular application of such self-regulation was outside the purview of the antitrust laws (373 U.S. 357, 83 S.Ct. 1246) since the collective refusal occurred under wholly unjustified circumstances—without notice and hearing prior to the Exchange's action.

The Court believes that defendants' reliance upon *Silver* in this case is misplaced. There is no statute here involved which might be construed *in pari materia* with the antitrust laws which justifies defendant LPGA's "self-regulation." The Supreme Court in *Silver* created an exception to the *per se* rule when there is present another statute which justifies concerted action which would otherwise be a *per se* violation of Section 1 of the Sherman Act.[3] *Silver*

---

3. It should be noted that the statute involved in *Silver* "specifically requires that registration cannot be granted 'unless the rules of the exchange include provision for the expulsion, suspension, or disciplin- ing of a member for conduct or proceeding inconsistent with just and equitable principles of trade . . . ,' § 6(b), 15 U.S.C. § 78f(b)." [373 U.S. at 353, 83 S.Ct. at 1255]

did not sanction concerted actions not justified by some other federal statute. Some courts have focused on the phrase "or otherwise" (373 U.S. at 349, 83 S.Ct. 1246) in the Supreme Court's opinion in *Silver* and have concluded that the Court intended to include within its exception cases wherein self-regulatory activities providing for notice and an opportunity for hearings exist without legislative mandate. *See,* Tropic Film Corp. v. Paramount Pictures Corp., 319 F.Supp. 1247, 1253 (S.D.N.Y.1970); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1064–1065 (C.D.Cal. 1971) (dictum). However, this Court does not construe the exception to the *per se* rule announced in *Silver,* notwithstanding the "or otherwise" language, to sweep that broadly.

The question posed in *Silver* was whether the existence of a statutory framework for self-government in the security industry repealed the antitrust laws to that extent. The Supreme Court stated that "This means that any repealer of the antitrust laws must be discerned as a matter of implication, and '[i]t is a cardinal principle of construction that repeals by implication are not favored.' " [373 U.S. 357, 83 S.Ct. 1257] *A fortiorari,* a private, nonstatutory rule to govern a private association cannot repeal by implication a federal statute, the "law of the land." Whatever the "or otherwise" in *Silver* refers to, it is clear that it necessarily must be of sufficient force and effect impliedly to repeal a federal statute. This Court cannot ascribe that weight to the Constitution and By-Laws of the LPGA. Thus, the Supreme Court in *Fashion Originators Guild of America, supra,* in rejecting the proposition that it is permissible for a private association to engage in boycott activity to police its members' activities, described the defendant private association as (312 U.S. 465, 61 S.Ct. 707):

> ". . . in reality an extra-governmental agency, which prescribed rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.' "

The Supreme Court in *Silver* cited *Fashion Originators Guild* as primary support for the proposition that a group boycott is *per se* illegal (373 U.S. 347, 83 S.Ct. 1246). Therefore, it seems clear that the "or otherwise" language in *Silver* does not sanction the kind of group action present in *Fashion Originators Guild*—i. e., by a private association—which is exactly the situation in this case. Therefore, since there is no other statute present in the instant case which would justify the suspension (i. e., exclusion) of plaintiff by her own competitors (a particular exercise of self-regulation), the Court concludes that this case does not fall within the exception to the *per se* rule announced in *Silver,* but, in fact, is identical to the type of conduct proscribed in *Fashion Originators Guild, supra.*

Defendants have also cited the cases of Molinas v. National Basketball Association, 190 F.Supp. 241 (S.D.N.Y.1961), and Deesen v. Professional Golfers' Association of America, 358 F.2d 165 (9th Cir. 1966). The Court finds these cases to be inapposite. The facts in *Molinas* demonstrate that Molinas, a professional basketball player, was suspended by the president of the National Basketball Association who was acting pursuant to a clause in Molinas's contract and a league rule prohibiting gambling. The suspension was not imposed by Molinas's competitors.

In the *Deesen* case, Deesen, a professional golfer and a member of the Professional Golfer's Association [PGA], had his approved tournament player status terminated by the PGA's national tournament committee. The national tournament committee was largely composed of non-competitors of Deesen (the only exception being Bob Rosburg).

Furthermore, the Court of Appeals relied heavily on the fact that notwithstanding that Deesen's tournament status had been terminated, Deesen was not completely excluded from the market (tournaments) as he could still participate therein, if he chose to become a golf teacher employed by a golf club (358 F.2d 172). The termination in *Deesen* was based upon virtually a mathematical application of pre-determined standards. It did not involve a completely unfettered, subjective and discretionary determination of an exclusionary sanction by a tribunal wholly composed of competitors, as here. Consequently, we are not persuaded that the holding in *Deesen* is contrary to *McQuade* or *Fashion Originators Guild* in regard to the *per se* illegality of group boycotts.

Pursuant to the requirements of Fed. R.Civ.P. 56(d), the Court finds that the following facts are not in dispute:

(1) Defendant LPGA conducts its business in such a manner as to constitute interstate commerce;

(2) Defendants Sullivan, Rankin, Craft, Zavichas, and Miller, members of defendants LPGA's Executive Committee and competitors of plaintiff, combined to impose upon plaintiff a one-year suspension from defendant LPGA.

■ By reason of these undisputed facts and for the reasons stated above, the Court orders that partial summary judgment in favor of plaintiff be GRANTED to the limited extent of ruling that plaintiff's suspension by her competitors, defendants Sullivan, Rankin, Craft, Zavichas and Miller through the mechanism of defendant LPGA, was in violation of § 1 of the Sherman Act. This ruling does not reach the self-policing activities of defendant LPGA which are less than exclusionary in their effect.

■ Defendants Erickson and McCauliff have moved for summary judgments contending that they were not voting members of the Executive Committee and did not vote to suspend plaintiff. Notwithstanding the fact that these two defendants did not vote to suspend plaintiff, there is *inter alia*, a genuine issue of material fact as to whether these defendants acquiesced in and implemented the suspension of plaintiff by her competitors. *See* United States v. Paramount Pictures, 334 U.S. 131, 147, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Vandervelde v. Put and Call Brokers and Dealers Ass'n, 344 F.Supp. 118, 155 (S. D.N.Y.1972). Therefore, the motions for summary judgment filed by defendants Erickson and McCauliff are denied.

In conjunction with the trial of the other issues raised in the complaint, a determination of whether permanent injunctive relief, money damages or both are appropriate will be made.

Since plaintiff's suspension has expired by its own terms, no further injunctive relief seems required, and the preliminary injunction heretofore granted is dissolved. Likewise, defendants' request for an increase in bond is denied as the import of this order is that the prior suspension, which was enjoined, violated the antitrust laws and plaintiff is entitled to her winnings during the period of the purported suspension.