**Peter M. BRANT, Plaintiff,**

v.

**UNITED STATES POLO ASSOC., Norman Brinker, W. Mackall Jason, S.K. Johnston, Jr., Donald V. Little, John C. Oxley, Stephen A. Orthwein, William Sinclaire, and George C. Haas, Jr., Defendants.**

No. 86–8093–CIV.

United States District Court,
S.D. Florida.

Feb. 24, 1986.

S. Skip Taylor, Miami, Fla., for plaintiff.

Charles C. Kline, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for defendants.

MARCUS, District Judge.

The Plaintiff in this action Peter Brant, a player-member of the United States Polo Association, has sought preliminary injunctive relief seeking to enjoin the Defendants, United States Polo Association (hereinafter USPA), Norman Brinker, W. Mackall Jason, S.K. Johnston, Jr., Donald V. Little, John C. Oxley, Stephen A. Orthwein, William Sinclaire, and George C. Haas, Jr., from suspending him from participation "in official or sanctioned events of the Association" from January 28, 1986 through March 10, 1986.

On February 18, 1986, Plaintiff filed this civil action seeking damages and injunctive relief from alleged violations of Section 1 of the Sherman Act, 15 U.S.C. Section 1 *et seq.* and for defamation to the Plaintiff's reputation and ability to conduct business. Plaintiff sought emergency and *ex parte* injunctive relief at the time he filed this Complaint alleging that he would suffer immediate and irreparable injury if he were not permitted to participate specifically in the Defendant USPA sanctioned "Gold Cup" match, apparently scheduled to begin on February 25, 1986 and conclude on or about March 9, 1986. In view of the immediate time constraints presented by this Motion for Emergency Injunction Relief, we set this cause down for an evidentiary hearing and argument, upon three days notice to all parties, and to obtain evidence from both Plaintiff and Defendants on Friday, February 21, 1986.

Plaintiff's Complaint alleges that the Defendants have illegally combined and conspired to create a group boycott in restraint of trade by excluding him from participation in USPA sanctioned matches. Plaintiff has contended that his suspension constituted a *per se* violation of Section 1 of the Sherman Act, and that the suspension was designed and intended to impede and impair competition: (1) by damaging Plaintiff's reputation and thereby obstruct-

ing his ability to form a rival organization which would compete directly with Defendant USPA in sanctioning various polo matches and obtaining corporate sponsorship for those matches; (2) by limiting Plaintiff's ability to promote his own polo clubs, the Greenwich Polo Club, and the Saratoga Polo Association; (3) by limiting Plaintiff's ability to attract foreign professional polo players who would compete in USPA sanctioned events, and thus inferentially limiting the competitive position of Plaintiff's polo team; and finally (4) by effecting his suspension without full notice or a fair adversarial hearing. Defendants conversely have contended, simply enough, that Plaintiff was suspended—after notice and hearing—from playing in a single polo match sanctioned by USPA, because he violated the rules of the Association by verbally abusing the umpires during a polo match on June 13, 1985, and at one point threatening one of the umpires with a fist fight.

For the reasons enumerated at length below, we find that, at least on this record, Plaintiff has failed to meet his burden of proof, and accordingly we deny his application for preliminary injunctive relief.

### I.

The pertinent facts adduced at the February 21, 1986 hearing are these:

The Defendant USPA is a voluntary, non-profit corporation organized in Illinois "for the purpose of monitoring the game of polo, coordinating the activities of its member clubs and arranging and supervising national and international polo games." The Association promulgates rules and handicaps to govern the conduct of the game. Membership in the Defendant Association consists of various polo clubs around the country (including two owned by Plaintiff, the Greenwich Polo Club and the Saratoga Club) and various individual participating members, including Plaintiff Peter Brant. However, perhaps 90% of the polo games conducted are not sanctioned by the Defendant USPA; and perhaps 75% of "high goal polo" or the most profession-

al and competitive polo matches are also not sanctioned by Defendant.

The Articles of Incorporation and By-Laws of the Defendant Association bind the member clubs and individual participants to follow the promulgated rules of the game. Among other things, the by-laws (Article 10) proscribe certain conduct violating the fundamental objectives of the game and the Association, such as "intentionally or carelessly dangerous, abusive, hostile or disorderly" conduct exceeding "the limits of the rules of the game and the constraints of good sportsmanship." The sport of polo, involving speed, thousand-pound horses, and mallets used to strike a ball, can be a dangerous one.

The ruling "Executive Committee" of the Association is made up of nine members, many of whom actively participate in playing the game, and some of whom, like Plaintiff, own and operate polo clubs around the country. Eight of the individual Defendants in this case are members of the Executive Committee and participated in the decision to suspend Plaintiff for some 44 days. The ninth member, Alan Sherer, Treasurer of the USPA and member of the Executive Committee, did not participate in the vote which led to the disputed suspension because he had an apparent "conflict of interest" being an employee of Plaintiff's polo club.

Membership in the Defendant Association is voluntary and polo players are free to participate in the game without being a member. Moreover, there is no prohibition on being a member of any other polo association. Indeed, as we've noted, most polo matches around the country are not sanctioned by the Defendant Association, although its member clubs conduct many events throughout the year. No purse or prize money was offered in connection with the Defendant's "Gold Cup" match, although it is one of the Association's premier events of the year. Participation in this event, however, is not a prerequisite to the participation in any other event. At least three members of the Executive Committee participating in the censure of Plain-

tiff are player-participants on competing teams in the 1986 "Gold Cup," and a fourth member is an "alternate" player.

The Plaintiff Peter Brant, a polo player and participant for some eight or nine years, is an individual member of the Defendant USPA; and he is the owner of two member clubs—the Greenwich Polo Club and the Saratoga Polo Association. The Greenwich Polo Club is part of a large real estate development owned by Plaintiff in Connecticut, and designed to be sold in 10 acre parcels to people who play polo or develop polo teams. Additionally, Plaintiff is Chief Executive Officer of a privately held newsprint manufacturing company, and the publisher of certain "antique" and "art" publications. Moreover, Plaintiff breeds and races thoroughbred horses.

Plaintiff contended at this preliminary hearing that his reputation as a polo player was critical to his ability to function in the polo and horse breeding and racing businesses. Plaintiff further testified that Defendant Don Little, a member of the Defendant Association's Executive Committee actively competes with him in the thoroughbred business, and that Little also owns a competing polo club in Massachusetts. Plaintiff suggested that he and Little compete for polo players, teams and tournaments. Moreover, Defendant George C. Haas, Jr., also owned a competing polo club, the Fairfield Hunt Club, within thirty miles of Plaintiff's Greenwich Club. After a while the Fairfield Club folded as a polo club competitor. Finally, Defendant S.K. Johnston, Jr., Chairman of the Executive Committee, owns a polo club in Tennessee.

Plaintiff indicated that he is in the process of forming a rival polo association to compete directly with the Defendant USPA, that it is seeking to attract high goal polo players, whereas 95% of the polo players are characterized as "low goal polo players," that CBS Sports has agreed to televise a polo match which he has planned, and that since he entered the polo business as a player some eight years ago he has found himself in an "adversarial relationship" with the governing members of the Defendant USPA. Plaintiff suggested that the Defendant Association, which ranks polo players according to skill, has discriminated against him and his team in the ranking of younger foreign players whom he has attracted to competitive polo in this country.

The polo match precipitating Plaintiff's suspension occurred on June 13, 1985 at the Greenwich Polo Club. The match was not sanctioned by the USPA, but was being played by Defendant Association members at Defendant Association member club governed by Defendant USPA rules. During the course of the match in which Plaintiff and his team participated, another player on Plaintiff's team fell and injured himself and Plaintiff, along with another player, got into a series of arguments with the umpires. The umpires subsequently lodged a written complaint with the Defendant USPA about Plaintiff's conduct during the game. Two umpires, who were also active players in other matches, contended in their letter of June 14, 1985, that during a match between White Birch Farm (Plaintiff's team) and Cellular Farms, Plaintiff objected to most of the decisions made about certain infractions committed during the game. Plaintiff's insults were termed "foul" and loud enough to be heard by the spectators. At one point Plaintiff called the umpires "fucking umpires." As the verbal invective grew, one of the umpires, Augusto Gomez Romero, left the field, either throwing his whistle to the ground, or at Plaintiff, as Brant referred to him as a "son of a bitch." Soon thereafter Plaintiff approached Gomez Romero at the sidelines and challenged him to a fist fight. The umpire left the game and the match proceeded with only one umpire officiating. The umpires asked the Defendant Association "to stop these incidents from occurring in the future."

Defendant Johnston, as Chairman of the Executive Committee, testified that he received this unsolicited complaint from the umpires, and pursuant to the Defendant Association rules, formed a committee to

investigate the charges. Johnston told Plaintiff about the charges, in his words "item by item," although there was conflicting testimony about whether Johnston mailed a copy of the umpire's letter to Plaintiff, who claimed he never saw the letter until the day of the hearing. Plaintiff did, however, respond in writing to Johnston on June 25, 1985, providing him his account of the incident. Plaintiff conceded he was wrong insofar as he verbally abused an umpire, and asked the umpire to settle the matter after the game, "hand to hand." Plaintiff contended, however, that the officiating was bad, serious injury had occurred to some of the players, and that complete control of the game was lost. Johnston further testified that during a telephone conversation Plaintiff admitted having lost his temper at the game.

This was not the first reprimand Plaintiff had received apparently for arguing or confronting the umpires. A letter dated February 16, 1983 from the Palm Beach Polo and Country Club discussed a "confrontation" which Plaintiff had on February 2, 1983, censured him in order to insure "proper conduct and respect toward officials" and placed Plaintiff on "probation" at that club for the remainder of the 1983 season. On March 25, 1983, the Defendant USPA warned Plaintiff as captain of his team about "unsportsmanlike conduct." Again on July 7, 1983, the USPA admonished Plaintiff for another incident at a polo match. That letter referred to Plaintiff's "sharp and seemingly ungovernable temper," and warned him that his conduct would continue to be scrutinized.

Defendant Johnston notified Plaintiff by letter dated June 25, 1985, about the complaint lodged by the umpires about the June 13, 1985, match and advised Plaintiff that he had asked the Circuit Governor to form a committee to investigate the charges. A three member investigating committee examined the charges and, in a report to Johnston, confirmed that the umpires' complaints were accurate, only in dispute was whether the umpire threw his whistle at Plaintiff or down on the ground. The committee noted that the Greenwich Polo Club had already levied a $2,000 fine at Plaintiff for his behavior, and also wrote a letter censuring the umpire for leaving the game. The committee recommended that Plaintiff be fined $1,000.

While the matter was pending, a second complaint about Plaintiff's behavior was lodged with Defendant USPA from umpires who officiated a game on July 20, 1985. The complaint asserted that Plaintiff was disrespectful towards two umpires, that Plaintiff constantly complained about their calls and that Plaintiff was quoted later in the local newspaper as having criticized the umpires' conduct.

The President of the Defendant Association notified Plaintiff that the Executive Committee would give him the opportunity to be heard before any decision was taken. A meeting was held by the Executive Committee in San Antonio, Texas, on October 19, 1985, at which time Plaintiff was placed on one year's probation for using abusive language against umpires and directed to appear before the committee at its January meeting. Plaintiff, although invited to attend by letter dated August 22, 1985, was unable to appear. The "probation sanction" did not bar Plaintiff from participating in any Defendant Association sanctioned matches, rather it served as a sign or warning that Plaintiff had a "problem."

The matter was scheduled for a full hearing on January 25, 1986. Plaintiff was invited to appear, although apparently it was suggested that he come without an attorney. At that time the charges were discussed, mainly focusing upon the June 13, 1985, incident, although other complaints were mentioned. Plaintiff was given an opportunity to be heard, but apparently added little to his letter of June 25, 1985, about the altercation. No verbatim account or record of the meeting was made. The committee decided that a $1,000 fine violated the by-laws of the Association which only permitted a $50 fine, and that a monetary fine for so wealthy a man would constitute no real penalty. Accordingly, Plaintiff was suspended by the Executive Committee from participation in

official or sanctioned Association events from January 28 through March 10, 1986. The purpose and effect of the suspension was to knock Plaintiff out of the "Gold Cup" Tournament, although his team was not suspended from the competition.

## II.

It is by now clear that the moving party in an action seeking preliminary injunctive relief pursuant to Fed.R.Civ.P. 65 bears the burden of establishing four criteria: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of injunctive relief; (3) a balance of hardships favoring the movant; and (4) the advancement of some discernible public interest by entering injunctive relief. *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974).

Plaintiff's Motion for Injunctive Relief is based on the beguilingly simple theory that his suspension by Defendants constitutes a horizontal group boycott by his competitors and thus is a *per se* violation of Sherman 1. In support Plaintiff relies solely on two cases, *Blalock v. Ladies Professional Golf Association*, 359 F.Supp. 1260 (N.D.Ga. 1973) and *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D. Cal.1971). Both are cited for the proposition that Defendant's conduct constitutes a *per se* violation of the antitrust laws, and thus that no further examination of the challenged conduct need occur. In fact the caselaw has developed substantially since those cases were decided, and a *per se* approach has been shunned for a rule of reason approach both by the Supreme Court and numerous lower courts, including this Circuit, in examining the legality of certain actions taken by various sporting associations.

The starting point of any analysis must be the recently decided Supreme Court case of *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). In that case the Supreme Court applied the rule of reason analysis to determine whether NCAA restraints on televising college football games are an unlawful horizontal restraint

of trade. The High Court struck down the NCAA television plan which limited the total amount of televised intercollegiate football and the number of games that an NCAA member team might televise. The analysis employed by the Court is particularly instructive here. Justice Stevens, writing for the majority, noted that certain horizontal economic restraints such as price-fixing and output limitation "are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that the practices are anticompetitive is so high." A *per se* rule will be employed when "the practice facially appears to be one that would always or almost always tend to restrict competition." *Id.*, 468 U.S. at ——, 104 S.Ct. at 2960, 82 L.Ed.2d at 83. In this context the restraint "is presumed unreasonable without inquiry into the particular market context in which it is found." The Court refused to employ a *per se* analysis in the context of NCAA college football, not because NCAA was organized as a non-profit entity but rather because the case involved "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.*, 468 U.S. at ——, 104 S.Ct. at 2961, 82 L.Ed.2d at 84. Like a league of lacrosse teams, NCAA football requires the creation of certain rules of the game to effect competition itself. And "this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete." Thus, "the integrity of the 'product' cannot be preserved except by mutual agreement; if an institution adopted such restrictions unilaterally, its effectiveness as a competitor on the playing field might soon be destroyed." *Id.*

Of course, the rule of reason approach does not end the analysis. The central inquiry always remains the same: what is the competitive impact or significance of

the restraint, or contract or combination; does the restraint have as its effect the enhancement of competition or conversely does it restrain price and output. Ultimately the question the movant must answer here is whether this suspension of Plaintiff for some 44 days from the USPA sanctioned "Gold Cup" restrains price, restricts competition and decreases output. We think on the record evidence developed so far, Plaintiff has failed to establish any substantial likelihood of success on the merits. First, he has misapprehended the governing standard or analytical device to be used in measuring the challenged conduct (suspension) against any competitive model. He has failed to show this Court why the suspension of a polo player for verbal abuse of referees or umpires, in conformity with well recognized and codified rules and standards, should be perceived as "illegal *per se* " because of some apparent "probability" that this practice is anticompetitive. He has failed, in short, to show this Court that a facially neutral rule in a competitive and dangerous sport designed to limit the propensity to violence "appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979).

The application of a rule of reason has been employed by a number of lower federal courts facing challenges to the enforcement of rules in a sports self-regulation context. *See e.g., M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973 (1st Cir.1984); *Cha-Car Inc. v. Calder Race Course, Inc.*, 752 F.2d 609 (11th Cir.1985) (race track could subjectively allocate a limited number of stalls to those horses which the race track owner thought were the best horses); *Neeld v. National Hockey League*, 594 F.2d 1297, 1300 (9th Cir.1979) (enforcement by NHL of by-law prohibiting one-eyed player from playing in league did not constitute unreasonable restraint given safety purpose and "de minimus" competitive effect); *Cooney v. American Horse Shows Association, Inc.*, 495 F.Supp. 424, 431 (S.D.N.Y.1980) (horse trainer's suspension for violation of the association drug

rule designed to foster fair competition and preserve integrity of sport held reasonable where procompetitive benefits of the rule were predominant); *Justice v. National Collegiate Athletic Association*, 577 F.Supp. 356 (D.Arizona 1983) (student football players who were members of team which was suspended and thereby prevented from post-season competition unsuccessfully challenged NCAA because sanctions imposed preserved amateurism and promoted fair competition in intercollegiate sports).

Second, Plaintiff has failed to establish, at least on this limited record, any substantial likelihood of success on the merits, using the rule of reason as the measuring rod to test the instant suspension. As we've noted, a sports rule designed to proscribe "intentionally or carelessly dangerous, abusive, hostile or disorderly" conduct is facially neutral, and quite apparently designed and intended to preserve the integrity of the game itself and thus patently procompetitive. Moreover the suspension here was triggered by a complaint from two umpires, rather than being somehow inspired by polo club owners and competitors. The 44-day time frame of the suspension was limited, effectively designed to knock Plaintiff out of participating in a single, albeit important, polo event. The record evidence establishes no effort to preclude Plaintiff's team from competing in the "Gold Cup," nor are either of Plaintiff's polo clubs, both members of Defendant USPA, penalized in any apparent way by Plaintiff's suspension, nor finally is Plaintiff or his team precluded from competing in any other polo match whether sanctioned by Defendant Association or not. Nothing in the Association's *neutral* rules limits or impedes Plaintiff in the establishment of a rival and competing polo association, nor prevents him from attracting competitive polo players to his teams.

Plaintiff's argument about the anticompetitive purpose and effect of the suspension is indirect, circumstantial and attenuated, and in our judgment insufficient to carry his burden at this early stage in the litigation. At most his case might arguably be suggestive that some of the mem-

bers of the Executive Committee might possibly have sought to damage his reputation, although, even if that were true, they waited for a sufficient opportunity to sanction abusive behavior as the mode for striking at him. This hypothesis of an anticompetitive purpose or intent is undercut, at least on this record, by the attendant circumstances surrounding the suspension, the triggering mechanism, the Plaintiff's admittedly violative conduct, and the limited nature of the Defendant's sanction. Moreover, Plaintiff has failed to establish, at least on this limited record, that the impact of his suspension for 44 days will have any palpable anticompetitive effect on the conduct of his team, or his polo clubs, or the formation of a rival league. While anti-trust injury or effect is often difficult to show, and damage to reputation often hard to quantify in financial terms, something more must be shown to justify injunctive relief than the barest possibility of tarnished reputation only collaterally and indirectly affecting Plaintiff's willingness or ability to compete in the industry. At the heart of Plaintiff's contention is his substantial disagreement with the Executive Committee's decision to temporarily suspend him. Standing alone, or even coupled with the few additional facts adduced at the February 21st hearing, the evidence is surely insufficient to warrant this Court to preliminarily enjoin Defendant USPA. Really Plaintiff seems only to invite us to substitute our judgment for that exercised by the Defendant Association. This Court, however, does not sit as a board of appellate review of the wisdom of Defendant Association. Our analysis is limited to examine the purportedly anticompetitive purpose and effect of the suspension and no more. On this record Plaintiff has established neither.

We find nothing in *Blalock v. Ladies Professional Golf Association, supra,* or in *Denver Rockets v. All-Pro Management, Inc., supra,* that would lead us to a different conclusion. *Blalock* involved the suspension of a female professional golfer for one year from the LPGA for cheating. While the *Blalock* court applied the *per se* rule—and we think that standard no longer

applicable in a sport context where the challenged rule is facially neutral and designed to enhance the game's integrity— the facts were significantly different from those we face today. The *Blalock* suspension meant not only exclusion from LPGA sponsored tournaments, but because of the LPGA by-laws preventing LPGA members from the opportunity to participate in any tournaments, that Plaintiff was effectively precluded from playing in any tournaments for a whole year. Nothing remotely similar has occurred in this case. Moreover in *Blalock* Plaintiff had been before the board at the time she was placed on probation and fined; unlike Plaintiff Brant, she had no opportunity to be heard before she was suddenly suspended by her player-competitors. In the instant case Plaintiff Brant was given some notice of the charges, both orally by Chairman Johnston and in writing, which apprised him at least about the specific incident in question. Plaintiff Brant was also given the opportunity to be heard and defend himself in a context, which, while perhaps not comporting with the rigors required by due process in a court of law, were sufficient to enable him to present his side of the incident.

The *Denver Rockets* case also involved a substantially different fact pattern, raising a challenge to an NBA rule that prohibited an otherwise qualified player from negotiating with any NBA team until four years after high school graduation. The breadth of the rule and the fact that it provided for no exceptions alone distinguish that case from this one. Nothing in *Denver Rockets* undercuts the valid purpose of self regulation in competitive sports, nor the promulgation of neutral rules of behavior to enhance competition itself.

Finally, we address Plaintiff's last contention, that he was denied basic due process by the conduct of the Defendants in this suspension. Most recently the Supreme Court addressed the issue of procedural safeguards in the context of whether a *per se* violation of Sherman 1 was made out where a cooperative buying agency comprised of various retailers expelled a member. In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and*

*Printing Co.*, — U.S. ——, ——, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202, 210–211 (1985) the Supreme Court observed that

"... the absence of procedural safeguards can in no sense determine antitrust analysis. If the challenged concerted activity of Northwest's members would amount to a *per se* violation of Section 1 of the Sherman Act, no amount of procedural protection would save it. If the challenged action would not amount to a violation of Section 1, no lack of procedural protection would convert it into a *per se* violation because the antitrust laws do not themselves impose on joint ventures a requirement of process."

Some antitrust cases have stood for the proposition that *per se* analysis must be applied to a Sherman 1 action where procedural due process was lacking. The Supreme Court in *Northwest Wholesale Stationers* rejected the application of that doctrine, and the holding of *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) to private self regulatory associations as opposed to governmental regulatory associations.

The most Plaintiff could argue, then, would be that the lack of procedural due process and fair play in the suspension process somehow evidences an anticompetitive motive or intent. On this limited record, however, the facts fairly support no such inference. The inquiry resulting in suspension was triggered by a complaint from two umpires. Plaintiff was given some notice, and the opportunity to be heard and the suspension was not affected until he presented his side of the incident. The sanction itself was limited, and agreed upon unanimously by those who were competing players, with competing teams, or clubs, and those who did not compete. And finally, the actions were taken only after more than one complaint was leveled by umpires at Plaintiff's conduct. In short, while not perfect, this suspension process, on this record, cannot support a reasoned inference of anticompetitive intent.

For the reasons stated hereinabove, we think Plaintiff has failed to establish the requisite quantum of proof to support the entry of preliminary injunctive relief. We do not suggest by this opinion that Plaintiff will ultimately be unable to meet his burden at trial as to the Sherman Act claim or a defamation claim; only that in the short time available, he has been unable to do so. Accordingly, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Emergency Application for Injunctive Relief is DENIED.